Our next case for argument is 24-1185, Larson v. HHS. Good morning, Your Honors. John McHugh from 305 Broadway, New York, New York for Ms. Larson. This case is relatively simple. It's a matter of not reading the entire record and relying only on the doctors. The issue here is we have the doctor who first diagnosed her as having likely GBS, G.M. Baird's Syndrome, in Wisconsin. He said that she had facial dysplasia. Facial dysplasia is essentially an inability to control the muscles of the face. They lack tone. And is it something that occurs intermittently? No. Is it a one-off, or is it kind of a permanent, ongoing thing? It's permanent. It stays there as long as the disease is going full force. It disappears after a while, and that's one of the problems. But here we have the doctor who diagnosed her didn't have the proper equipment to deal with a case of GBS. I'm sorry. Can I just get a more fulsome answer? So you say it disappears when the disease goes down? I mean, your client in this case has been going on for 10 years. Is this a – I don't want to go outside the record, but just understanding what the effects of this is. Does this last forever as long as the client does have – The facial dysplasia might be lasting forever. In her case, she says her smile is not the way it was. Her face doesn't look the same when she smiles. Otherwise, pretty much, it started in December, and it was pretty much gone by March. But that was the – when you look at it from the outside, her view is when she looks in the mirror, she doesn't look right. And that's continued. But in this case, we have the doctor diagnosed that saw it. He put her in an ambulance to go to a better hospital in Milwaukee because he didn't have the proper control – the proper equipment to control if she stopped breathing. So he had to get her to a respirator. The doctor who took over when she got to St. Luke's Hospital in Milwaukee didn't note the – he didn't see this facial dysplasia. Well, can I ask – that's Dr. Ravichandran? I don't know if I'm saying his name right. Ravichandran? Ravichandran, yes. Okay. Well, in any event, did he note an absence of facial dysplasia? Did he actually say, quote, no plagia, plagia, whatever it is? I mean, the reason I ask is because the page in the record where supposedly that quote appears was not given to us in the appendix, and I couldn't get it online because it's confidential medical information. So I wasn't able to verify. Did he actually – what I'm trying to figure out is, did that doctor simply remain silent and not speak about facial dysplasia at all because he was focused on the respiratory symptoms, or did he actually have a notation in the record, no facial dysplasia? Well, I must agree with you. I have not seen such a record. I've seen it referred to by the attorneys on the other side, but I have never seen it. And so I don't know. But I do know that I've seen him quoted as having given notes three times. Every day she was there. But the fact of the matter is he's the doctor, he's a neurologist, he should know. But we have another source. We have the nurses. The nurses in the neurology department look at the patients every few hours, and they take notes. And their note for the entire term that she was there was she had the symptoms of facial dysplasia, which is the inability to control the face, and also she had an inability to feel. Her face was numb. And she also had a speech problem. And all those things are contained time and time again in the nurse's notes. So we have Dr. Pidgeon up in Lakeland Hospital saying she had it when it started, and he thought it was a serious emergency because she was deteriorating as she walked at that time. And that's why she was shipped off before anything else was done in Lakeland. But we have the nurse's notes that are consistent with it still there. Okay, can I ask you to look at appendix page 410? Okay. Appendix page 410. Okay. So appendix page 410, these are the intake notes from the hospital, and that's the doctor whose name I was having trouble pronouncing, Robert Chandran. And at the top you see there's what looks like a Bates stamp, and it says page 78 of 101. Do you see that? Yes. Okay. Well, the special master found that on page 77 of 101 is where this exact medical record has the, quote, So unfortunately, you see that's just not in our appendix. Do you see how it goes from page 400 on the one end to 410 on the other? I see that, yes. So when you say you've never seen it or you've never had it, you have the record, you participated in putting this appendix together, correct? I did, yes. So you probably, does that mean you probably somewhere have the preceding page? Oh, I absolutely would. Oh, okay. How about this? You say you never saw it. Do you dispute the special master's finding that on the preceding page, not this page, the preceding page, which is not in our appendix, but which you clearly must have, that that quote is present there? Yes, I've been dealing with that quote as being that he said he didn't see it. Do you agree that the quote is present on the medical record on the page preceding what was included? Yes, that's right. Okay, that's what I knew. What I'm saying is that he was one witness, but we have nurses who are recording her condition every few hours for the entire period she was in that hospital, and they record this facial problem. They don't call it facial dysplasia, they just give it the symptoms, which is the inability to get control of the face. And is it clear, excuse my ignorance because I don't have a medical degree, is it clear that facial dysplasia is not anywhere near a symptom of fibromyalgia? That is very clear because their expert said that. Our expert also said it, but he said it emphatically, no, no, no. So we have a situation where they relied on the doctor's notes, they didn't check with the nurses, and then when she gets back to Dr. Pidgeon a few days after she gets out of the hospital, she's still got it. And they record it. Counsel, if I agree that the special master erred on that one fact finding, the fact finding was the transience. The fact that the special master didn't disagree with all of what you're saying about the doctor before and all the nurses after noted it. Special master agreed with all that, but the special master then sided with the government's expert, Dr. Artinian, who said facial dysplasia is simply not transient in this way, and the special master ended up accepting that. So what you're saying is that that fact finding was not accurate. It was not accurate. But even if I agreed with you that fact finding is not accurate, the problem is that's not enough to get you to a reversal because the special master in this case found that was just one of three aspects of the clinical presentation, and each of those three aspects made it clear that she did not clinically present with GBS. He went through the other two aspects being, I think, her reflexes and the monophastic nature of the disorder not being present. Yes. So the problem is there's still substantial evidence for his overall fact finding that the clinical presentation doesn't support GBS, even if you're right that she had consistent facial dysplasia. So I don't know what to do, you know, because that doesn't get you to it. It's a fact in your favor, but I review the fact finding for substantial evidence, and there's all these other fact findings. Well, the special master in her decision listed if she has this, it should be very rare because she has a lot of things that only appear in a few cases of GBS, not all of them, and nothing appears in all of them. She had a very strange, mild case of GBS. It rang all the bells except it was inconsistent with what was normal, and we knew it was that. It is not normal, but it had all the symptoms, and she was badly crippled for a very long period of time because even though all the symptoms of the facial dysplasia disappeared by March, she had a relapse later on, and one of the symptoms that really... How did they disappear by March, though? Because she didn't have the infusions that are normally required in order to cause the GBS to abate. She went to St. Luke's on the theory that she was about to stop breathing. Instead, basically, a lot of these symptoms had dampened way down, and so basically they didn't do anything because they thought she basically was either misdiagnosed or cured, but at any rate, it didn't stop. It just kept going. Did you ever tell the special master your view was she had a... I think you described it as a mild, unusual case of GBS. I may have missed that. Well, that was in the... Dr. Kingsborn said it was a mild case of... He said it was a very mild case on onset. It didn't... It wasn't mild on the balance, so essentially... Well, what are you telling us? Because it appears the special master found it was... It wasn't GBS, but if it looked like GBS, it only even looked like GBS for a little bit of time. Well, it did look like GBS for a little bit of time. It came on like an express train, and then it just sort of... There was an ambulance ride, and they were about an hour, and by the time she got out of the ambulance, she was greatly improved, apparently, according to her, but she didn't lose all these symptoms for months, and so she was unable to work for months, and it wasn't until the next year, really, that she got back to work. Should we save some of your time for rebuttal? I want you to have a chance to respond to whatever the government says. I certainly will. Thank you. Okay. Good morning. May it please the Court. My name is Alex Sachs. I represent and respond to an appellee, the Secretary of Health and Human Services, in this matter. The special master correctly determined that Petitioner failed to establish by preponderant evidence that she suffered from a claimed injury of Guillain-Barre syndrome, and that as a result she was not entitled to compensation under the Vaccine Act. Because Petitioner was required to establish as a threshold matter that she suffered from the condition for which she sought compensation and failed to do so, the special master was not required to conduct a causation analysis under Alvin, and Petitioner could not prevail on entitlement. So I guess one question I have for you. Facial dysplasia appears to be, according to all the experts, one of the sort of key indications of GBS, especially early indications. Now, of course, there's other things, spinal tap. There's other things that can confirm whether it's GBS. But so it looks like she had the facial dysplasia. I mean, it's throughout the record. So what, I mean, what do we do? I mean, she had a vaccine. She then had facial dysplasia. I mean, you know, a bad back doesn't result in facial dysplasia, right? So something happened to this lady. Something happened. I mean, your face doesn't just get droopy and paralyzed overnight for no reason. At least, God, I hope not. You know, so what do we do about that? What does the government do about that? What does the Vaccine Act do about this when somebody has a reaction that is temporally linked to the vaccine and is very serious? Well, yes, Your Honor, one point of correction. This is diplegia. It's a little different from dysphagia. But similar in that it's a paralysis or bilateral. You could characterize it as drooping of the face. But in any regard, the special master's finding was wholly plausible that it was transient. She probably articulated rational reasons for why. That was the petitioner's outpatient doctor, the neurologist, Dr. Pidgeon, noted it on that day that he encouraged her to go to the ER on December 27th, 2013. Later that day, though, as my colleague was discussing, the hospice neurologist expressly noted the absence of that symptom, noplegia, that same day. Was he a neurologist? He's a neurologist. And you saw that we don't actually have that record. Have you seen that record? I've seen that record. And it really says that? It really says that. And he says it again in subsequent days. He didn't dispute it, but ultimately it wasn't in here, so I was struggling. Yeah, I understand. I apologize for that, Your Honor. And that is the rational basis in the record that gives rise to, again, this is not a wholly implausible determination by the special master. She notes that the symptom is noted by one doctor early in the day and then not the next day. And in addition to that, she credited the – Well, but it's noted by all the nurses over and over again. Well, the nurses do know facial weakness. Again, the special master considered all the evidence. She noted that this court precedent presumes that the special master considered all the evidence, unless she expressly stated that she didn't. She did not weigh it as heavily. And that's a matter of fact-finding. And obviously, as this court is aware, that's subject to the arbitrary and capricious standard of review. So the finding is – But even if I had a problem with that fact-finding, as I explained to counsel on the other side, it still would be very hard to get to a reversal because of all of the other fact-findings. Just on the clinical presentation, you had to mention the spinal fluid and whatever the other things. Yes, Your Honor. And it wasn't even really the critical of the one of three within the category of four other categories of the clinical presentation. Again, there was the fact there were no absent or decreased reflexes, which is very pathogenic of GBS. The fact that she recovered without very standard, gold standard treatment, immunotherapies, IVIG, and plasmapheresis. It is unusual, though. I don't know. We don't usually get a case in the vaccine act space where the question is, did she or did she not actually have a condition? Usually, you know, the cases are more causation-related. They're more about maybe damages even, but not about did the person have it. And it also seems really unusual when she actually did have three experts that testified that she did have it. That's really hard. I'm going to be honest. I'm surprised the special master came out the way she did. Very unusual. I've never seen a case where you have what is now a table injury. With certain criteria, I'm not sure. It wasn't at the time, but it is now. You have somebody that's presenting with some symptoms, and even the neurologist said high suspicion for GBS. That's what the neurologist said. He didn't rule it out. But he never confirmed it, Your Honor. He didn't confirm it, but he said high suspicion for GBS. And then later on, the subsequent neurologist who evaluated her determined that she didn't present with clinical presentation or objective evidence of a GBS diagnosis. I actually sat her down and said, I don't know how many hours I have to spend with this person. I'm telling her she doesn't have GBS. Like, I keep telling her she doesn't. No, I get it. The record has a lot in it, but I don't usually see cases where there's three experts saying the person has GBS and the special master concludes she doesn't. We have a fair amount of cases in the vaccine program that actually go to diagnosis as a threshold issue. Obviously, that is a threshold issue before the often-causation analysis. It's a petitioner's burden to establish that by pondered evidence prior to the analysis. Well, that's interesting to me that you do have quite a number of cases, because I don't think I've ever seen one on appeal. Do you have a sense that those don't get appealed to us? Is that also your sense? I don't want to give an incorrect answer. I think you're probably right, Your Honor, that they're appealed less often, but there have been appeals on the issue of diagnosis and whether it's established. I mean, the precedent that we have, it's been a while, but Brokelson, Lombardi, Hibbard all established this line of cases of petitioner's inability to meet her burden or his burden of establishing a diagnosis and how that is a prerequisite for the causation analysis. What does the table have? Like, I haven't seen it in a long time. It's got the diagnosis, and then it's got usually the time for onset. The time frame for onset for GBS, it's zero to 42 days. And then what? Is there a third category? I should know. There are various clinical aspects of it that must be met, but I'm not off the top of my head yet. Anything further? I have nothing further. All right, I set the court affirmed the decision of the Special Master in the Court of Federal Claims. Thank you. Your Honor, you're absolutely right. She got a vaccine. She had a reaction to it. As the table would dictate for GBS with the backache, it can't be nothing. The statute forbids idiopathic cause of something like this. It fits all the criteria for GBS. It was diagnosed several times as GBS. Everybody attributed to the vaccine except for their expert. And it can't be nothing. The statute doesn't allow an idiopathic or non-cause, something out of space. And we all have the same problem. This is a very unusual case. That's why it's here. And three experts, you're absolutely right, three experts said something happened here. And they thought it was that. And we can't go to zero. So I think that even though there may be questions about the diagnosis, there is a diagnosis. And there may be things that don't fit. But we have a vaccine. We have an injury. The timing is right. And the injury is one that is basically in the table. And I thank you very much. Okay. Thank both counsel. This case is taken under submission.